The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. Oyez, oyez, oyez, all persons having any manner or form of business before the Honorable United States Court of Appeals for the Fourth Circuit are admonished to draw nigh and give their attention, for the Court is now sitting. God save the United States and this Honorable Court. Good morning. Please be seated. We're happy to hear argument in our first case, number 144790, United States v. Kimmel. Counsel, would you mind identifying yourself? We usually have a crib sheet up here. Ah, a good clerk is going to bring it to us. And you can go ahead and start. Good morning, and may it please the Court. My name is Robert Waters, and I represent the appellant in this matter, Thomas Kimmel. Mr. Kimmel was sentenced in the Eastern District of North Carolina after application of a three-point enhancement, asserting that he was the manager or supervisor of a criminal enterprise pursuant to United States Sentencing Guideline 3B1.1B. For over 20 years, since 1995, this Court has consistently and repeatedly held that that particular enhancement is appropriate only when the defendant has exercised managerial or supervisory authority over another person, a participant in the criminal enterprise. The evidence adduced at trial did not show that Mr. Kimmel exercised such authority, nor did the District Court of Sentencing specifically find that Mr. Kimmel had exercised such authority. Therefore, the three-point enhancement is unsupported by law and improper in this case. Mr. Kimmel was involved in a business entity called Shirline Acceptance Corporation for Shirline. Shirline was in the business of purchasing used cars, refurbishing them, and then selling them for profit. The corporation was organized by Jim Kirk. Another member, Glenn Smith, communicated with prospective investors, sent them information packets on request. He took in the monies from investors, and he sent out interest payments to investors. A third member of the conspiracy, Carol Graff, managed the day-to-day operations of Shirline. And Mr. Kimmel was in the business of recruiting new investors. He gave seminars at churches across the United States, giving financial advice pursuant to Christian principles. And after he became involved with Shirline, he began telling persons at these seminars that Shirline was a sound and profitable business investment. And as it started, that was true. Shirline was capitalized by the value of the cars it owned, by real property and equipment that the corporation owned, and by monies coming into the corporation when cars were sold. Unfortunately, cars stopped selling. The only way that Shirline could make interest payments to existing investors was by using monies coming in from new investors. Shirline had become, in effect, a bonzi scheme. The scheme collapsed, and the company went bankrupt. Well, what employee or what person did he arguably supervise, and why didn't he supervise that person? In other words, let's try to have a little anticipation because the government gets to talk to us too, right? Yes, Your Honor. In this particular enterprise, there were only four participants. Mr. Kimmel himself, Jim Kirk, who started and organized Shirline, Glenn Smith, who handled communication to investors and the monies coming in and out, and Carol Graff, who handled the day-to-day operations. The government originally argued at sentencing that a fifth member, Gregory Barco, who had drawn up the financial instruments for Shirline, was also a participant. The district court did not find that Gregory Barco was a participant in the enterprise. The district court did find that the enterprise was extensive, even though it had only four participants, because it involved many outsiders. The over 300 investors into Shirline and a group of six pastors who comprised the spiritual board of advisors for Shirline. But the district court did not find that any of those persons were participants in the criminal enterprise. The only four participants were Mr. Kimmel himself, Kirk, Smith, and Graff. The district court didn't find that Mr. Kimmel specifically exercised authority over any of those particular persons. Rather, the court considered seven factors that are found in the commentary to 3B1.1b, including but not limited to decision-making and authority over another participant in the exercise. It considered the nature of the enterprise, the nature of Mr. Kimmel's involvement, whether or not he recruited other persons, and so on. The court found that considering all of these factors in toto, particularly the extent of Mr. Kimmel's involvement, the court found that the enhancement for manager-supervisor was appropriate. Essentially, the district court seemed to be finding that Mr. Kimmel essentially had substantial incline or independent authority to manage the fundraising aspect of Shirline, that he was the primary, by far, if not the sole fundraiser for Shirline. But that influence seemed to be exercised over the victims, correct, rather than the other persons in it? Yes, Your Honor. Actually, Mr. Kimmel had almost no communicate or very limited contact and communication with the other participants and almost the sole direct contact with the victims. The number of victims, as well as the six pastors on the spiritual board of advisors, were sufficient to support that the enterprise was extensive, even with only four participants, but they themselves were not participants in the criminal enterprise and any influence or authority that Mr. Kimmel exercised over them would not support the enhancement. So he didn't make any finding about people? No, Your Honor. The court made a step-by-step... It seems from our case law that that was required. Yes, Your Honor, I believe so. All right, let's hear what the government has to say. Maybe they have new news. I'm sorry, do you have anything? I think we understand the argument. Okay. That is the primary argument, Your Honor, that Mr. Kimmel did not exercise specific decision-making authority over any participant in the criminal enterprise, which would have been the three other participants, and therefore that the three-point enhancement under 3B1.1b is not proper. Okay, thank you, Your Honor. Was there the required finding? Yes, Your Honor, there was. Maybe you can tell me where it is. If you look at page 596 of the joint appendix, when the court is going through and addressing the first and the seventh factors, which are the decision-making authority and the degree of control or authority over others, the court typically found that the evidence at trial certainly showed that some of the co-conspirators were needed to increase his efforts. The defendant certainly made suggestions that better enabled the defendant to raise money for Shoreline. What's important about this case... I'm on 597 now. What are you looking at? That says the defendant certainly made suggestions that enabled the defendant to raise money for Shoreline. How does that refer to his control over other people? Well, what's important here is that the defendant exercised his control... No, no, you didn't answer the question. You directed our attention to this portion of the joint appendix, which says the defendant certainly made suggestions that better enabled the defendant to raise money for Shoreline. You directed our attention to that language. How does that reflect any control over other participants in the criminal enterprise? I would address the paragraph as a whole because first the court says that their other co-conspirators were needed. That indicates the relationship. And this court sat through trial and immediately after making that comment about that the defendant certainly made suggestions, the court goes into discussing specific changes that the defendant persuaded members of the company to make in order to allow him to better fundraise for this company. You said a key word right there. You had to persuade them. Yes. That's contractual managing. Basically they're conspirators. They say, you know, I think if we did it this way and changed it this way we could raise more money, we'd be more effective. That's not management. And the fact that you say I need someone else, that's not management. Where is the finding of managing someone? You just said he persuaded people. Managers tend not to have to persuade employees to do things. They tell them what to do. They do it. You said you had to persuade them. Your own words contradict what we were hoping that you would be able to tell us on your side that would make your case for the government. This guideline enhancement addresses the relative culpability and responsibility of these individuals. One of the key things that the court needs to address – So you're going to the general now. You're away from the specific question. I just want to make sure you finish your answer because I think it really drills down to that. But if you're going now to the general, you can argue that. This court has held that you need to have people that you're supervising for this enhancement. Now, you may not like that and you might not think that's required, but that's what we've held, right? Correct. Okay. So that's what we're looking for. Where's the evidence in this record that he supervised other participants in the criminal enterprise? The evidence is shown through the control that he exercised over these other individuals. Whenever he made a suggestion or proposed an idea, that was carried out. Throughout the entire course of this conspiracy, the defendant took steps to ensure greater and greater control. Okay. Well, the district court is saying here on 596 in the rest of the paragraph that you're referring to, Sherline made at least some charitable donations to churches as his suggestion. You're saying that's an exhibition of authority over other criminal participants? He made a suggestion and they decided to do it. Is that an exercise of authority over people? I think it demonstrates his power to influence or direct the people's behavior, yes. What it shows is that he was a very effective, what we call a development officer, if you will, fundraiser. I mean, he knew how to get people, their emotions and their spiritual, as we took advantage of, he did it. So he said, listen, if you cede some money more into the churches, that's our feeder system. Parishioners in churches become our victim. So if you cede it by being charitable to churches, that will enhance victim. That's not management. That's the nuances of being a good developer and a fundraiser became the mechanism of how they work. But that's not management people. But do you have anything better than this in the trial court's discussion of his exercising authority over participants in the enterprise? Well, there is that section. And also, to the extent that this court is not persuaded that the district court's discussion here is sufficient, I would argue that any procedural error in calculating the guidelines would be harmless. And the reason for that is that the court spent about 14 pages discussing its sentencing rationale. And in doing so, it took a very detailed look at the defendant. It went through all of the required factors. What other persons did he control? It's our position that he controlled Kirk and, to a lesser extent, Glenn Smith in the operations, in the areas that he was primarily responsible, the fundraising, the managing of that area. For example, if you look at the joint appendix on 188 and 238, you have Smith, who is describing his role. He says, I was given the position of chief financial officer and then made the direct contact person and the back office support for Mr. Tom Kimmel. Sounds like he's supporting somebody else. He's supporting the defendant. And he also says on 238, I took over everything he, referring to Barkow, was doing as far as supporting Kimmel's efforts. I think also the court appreciated the dynamic of the relationship between these parties. From the very beginning, it was clear that the defendant was ready and willing to take his business elsewhere. And that gave him a significant degree of control in that it gave him the power to influence. And whether it's called suggesting, persuading, or causing changes to happen, there is no doubt that throughout the course of this trial, the evidence showed that when the defendant wanted something to happen, Kirk or Glenn would make it happen. And I mean, there are specific instances of direction. For example, there's one portion where the defendant instructs Smith. He explains that there is a very important donor who is going to be arriving to review the car lots. And he basically says, you should come up and be here for that. You need to come up from Florida. And Smith does that. Smith drops everything and he does that. The defendant decided who was going to make this 1% club. The defendant didn't have any control over the money. He didn't have access to the bank accounts. So when he wanted these funds to be paid to his special pastors who were feeders, he directed Smith to do that. In fact, there's a portion where they're discussing the 1% club. And I think it's around – Was he asking Smith to do this, or did he have the power to require Smith to do this within the organizational structure? He starts your sentence with saying he didn't have any access to the bank account, it sounds like. Yeah. I mean, it seems to me he was asking that this be done. He wasn't exercising authority over Smith. And you're spinning it. I would disagree, Your Honor. What this showed was the defendant's control over his area. The district court made it abundantly clear in the area of fundraising and marketing, he was the man. And these are the decisions that he made. And he – What do you think that means? I noticed that idiom, he was the man. What do you think that meant in this context? What should we take from that? Tell me that. This defendant was essential to the success of the fraud. He was central in telling the lies, in interacting with the victims, and he caused the company to make changes that enabled him to better perpetrate the fraud. But really, this is what I'm saying. He was the bomb. And when it comes to raising money and getting people to come in and persuade them to give their money up, man, he was this and a bag of chips. You know what I'm saying? That's what he was raising. That doesn't mean you manage. It's like nobody can beat him. He's the top person. He knows what to do. He knows how to do it. I mean, that's a compliment, unfortunately, in a negative sense. But that's really not management. He's the man, like, hey, you've got to go to him for everything you need. He has all the bank accounts. It's not the doling out as it is. It's the expression of the skill that he has in doing what he does. I believe that whenever the court was saying that he's the man, it encompassed more than just that, his skill in the fundraising. There's no question that these other individuals would have never been able to take this fraud to the levels that the defendant did. The defendant was the one who said, we need to be able to access IRA. Well, that just means you're just telling us why he's culpable and why he deserved a lot of time in the penitentiary. I mean, I think the record clearly shows he deserves a significant penitentiary sentence based on what he did. But that doesn't answer the question whether he exercised authority over participants in the criminal enterprise. I mean, they're two different things. And while you're responding, if you could also tell me, I didn't see a harmless error argument in your brief. Is that correct? You didn't raise it then, but you're trying to raise it now? I believe that the brief did omit a harmlessness argument. However, I think that this court- What do the rules say about that? How does that impact your ability to argue that? I think that this court is always charged with doing a harmlessness analysis. That's part of the analysis that the Supreme Court- You haven't read any cases where people have waived harmless error arguments? I suppose the court could take that position, but here- I asked you a direct question. You've never read a case that does that? I can't think of one off the top of my head, but I'm sure I have read one at some point in time. Okay. But again, in this case, remanding because of the leadership enhancement, given the development of the record and given the court's clear indication that this would absolutely be the sentence that he would receive, a sentence that was some 96 months below his advisory guideline range, there isn't the need for this court to remand it, for the district court to do exactly the same thing as it's already done. Okay. I ask that you affirm the judgment of the district court. Thank you very much. Do you have any more comments? Very briefly, Your Honor. I believe the government has argued, and the district court did find that Mr. Kimmel was essential to the fundraising activity of the conspiracy. But that is simply not the same as saying that Mr. Kimmel exercised authority over another participant in the conspiracy, and this court has held that several times. So what is the relief that you get here? We would ask that the sentence be vacated and remanded for new sentencing proceedings, Your Honor. Of course, at the new sentencing proceedings, the district court could make a finding, I suppose. The district court could make a finding. Maybe it wouldn't be based on, you know, have it up for whether it's based on evidence or not, but they could correct the error. Or the court could apply an upward variance. But the enhancement itself, I think, is improper, and because it's so central to the general culpability of the defendant, this type of enhancement, I don't think that it could be deemed harmless. And I believe the government has waived that argument by not raising it below. Thank you, Your Honor. Thank you, Mr. Waters. We will come down and greet the lawyers and then go directly to our second case.
judges: Diana Gribbon Motz, Roger L. Gregory, Barbara Milano Keenan